**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| DOUGLAS K. T., | ) | NO. ED CV 18-1702-E |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| NANCY A. BERRYHILL, DEPUTY COMMISSIONER FOR OPERATIONS, SOCIAL SECURITY, | ) | **AND ORDER OF REMAND** |
| Defendant. | ) | |

Pursuant to sentence four of 42 U.S.C. section 405(g), IT IS HEREBY ORDERED that Plaintiff's and Defendant's motions for summary judgment are denied, and this matter is remanded for further administrative action consistent with this Opinion.

**PROCEEDINGS**

Plaintiff filed a complaint on August 14, 2018, seeking review of the Commissioner's denial of benefits. The parties consented to proceed before a United States Magistrate Judge on September 14, 2018. Plaintiff filed a motion for summary judgment on December 26, 2018.

Defendant filed a motion for summary judgment on February 13, 2019. The Court has taken the motions under submission without oral argument. <u>See</u> L.R. 7-15; "Order," filed August 23, 2018.

**BACKGROUND**

Plaintiff, a former bindery supervisor and truck driver, applied for disability insurance benefits, asserting disability since December 7, 2012, based on, <u>inter alia</u>, alleged cervical and lumbar spine injuries, headaches, diabetes, high blood pressure, an enlarged heart, kidney stones and limited mobility (Administrative Record ("A.R.") 52-55, 64-67, 79-80, 192-93, 215, 234, 261, 296). Plaintiff had not worked since he suffered a work-related fall which caused a loss of consciousness, several broken ribs, a punctured lung, and neck and back injuries (A.R. 67-68).

An Administrative Law Judge ("ALJ") reviewed the record and heard testimony from Plaintiff and a vocational expert (A.R. 43-94). Plaintiff testified to pain and limitations of allegedly disabling severity (A.R. 68-78). The ALJ found that, through Plaintiff's December 31, 2016 date last insured, Plaintiff had severe degenerative disc disease of the cervical spine, scoliosis and degenerative disc disease of the thoracic spine, and leveoscoliosis and degenerative disc disease of the lumbar spine (A.R. 21). However, the ALJ also found that, as of the date last insured, Plaintiff retained a residual functional capacity for light work, with: (1) standing and walking "for at least 10 minutes out of each hour of work up to 50 minutes out of each hour of work and for a total of about six hours out of an

eight-hour workday with regular breaks"; (2) sitting "for at least 10 minutes out of each hour of work up to 50 minutes out of each hour of work and for a total of about six hours out of an eight-hour workday with regular breaks"; (3) use of a hand-held assistive device (cane) in one hand when walking a distance of "about 100 yards or more," with the other hand available to carry up to 10 pounds while walking; (4) occasional "postural activities"; and (5) frequent "neck movements in any direction." <u>See</u> A.R. 26-37.  The ALJ rejected Plaintiff's allegations of disabling symptomatology as supposedly "inconsistent with the medical evidence of record" (A.R. 27-29).  The ALJ deemed Plaintiff capable of performing his past relevant work as a bindery supervisor (as generally performed) through the date last insured and, on that basis, denied disability benefits (A.R. 37-38 (adopting vocational expert testimony at A.R. 80-84)).

The Appeals Council denied review (A.R. 1-3).

## STANDARD OF REVIEW

Under 42 U.S.C. section 405(g), this Court reviews the Administration's decision to determine if: (1) the Administration's findings are supported by substantial evidence; and (2) the Administration used correct legal standards.  <u>See</u> <u>Carmickle v. Commissioner</u>, 533 F.3d 1155, 1159 (9th Cir. 2008); <u>Hoopai v. Astrue</u>, 499 F.3d 1071, 1074 (9th Cir. 2007); <u>see also</u> <u>Brewes v. Commissioner</u>, 682 F.3d 1157, 1161 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401

(1971) (citation and quotations omitted); see also Widmark v.
Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).

> If the evidence can support either outcome, the court may
> not substitute its judgment for that of the ALJ.  But the
> Commissioner's decision cannot be affirmed simply by
> isolating a specific quantum of supporting evidence.
> Rather, a court must consider the record as a whole,
> weighing both evidence that supports and evidence that
> detracts from the [administrative] conclusion.

Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and
quotations omitted).

**DISCUSSION**

After consideration of the record as a whole, the Court reverses
the Administration's decision in part and remands the matter for
further administrative proceedings.  As discussed below, the
Administration materially erred in evaluating the evidence of record.

**I.    Summary of the Relevant Medical Record.**

While driving for his employer, Plaintiff suffered a work-related
fall in Illinois on December 7, 2012 (A.R. 302).  Plaintiff drove with
his co-driver back to California after the fall (A.R. 313).  Testing
on December 9, 2012, showed several broken ribs and a puncture to the
left lung, for which Plaintiff was given a pain injection and admitted

to the hospital (A.R. 302-03, 306-10, 313).[1]  Plaintiff subsequently

was referred to various workers' compensation physicians who

prescribed Vicodin and placed Plaintiff on temporary total disability

(A.R. 313, 345-46).

On March 5, 2013, workers' compensation treating physician Dr.

Evan Marlowe evaluated Plaintiff and prepared an initial report (A.R.

312-25).  Plaintiff complained of blurred vision in his right eye,

dizziness, and constant pain in the neck radiating to his head causing

frequent sharp headaches, worsened by tilting his neck and by

prolonged sitting and standing (A.R. 314).  Plaintiff also reported

constant to intermittent pain and soreness in the mid back with

radiating soreness and pain to the sides of his back, constant pain in

the low back radiating down the legs to the feet with numbness and

tingling, increased with prolonged sitting, walking, standing,

bending, twisting, lifting, pushing and pulling (A.R. 314).[2]

Plaintiff reported difficulty with activities of daily living due to

pain when sitting, standing and walking for prolonged periods, an

inability to lift heavy objects, and problems sleeping due to pain

---

[1]     Thoracic spine x-rays also showed mild scoliosis and
moderate spondylosis, mild anterior wedge compression of the T8
and T9 vertibrae and multiple chronic healed fractured
deformities of the right-sided ribs (A.R. 307).  Chest x-rays
showed a borderline enlarged heart, atherosclerotic aorta, and
scarring in each lung base (A.R. 308).  Lumbar spine x-rays
showed mild anterior wedge compression of the T1 and T12
vertibrae, diffuse spondylosis and disc narrowing within the
lumbar spine, mutilevel vacuum phenomena, grade 1/4 degenerative
spondylosis at L4-L5, and mild levoscoliosis (A.R. 309).

[2]     A June, 2013 EMG study showed mild evidence of left S1
radiculopathy (A.R. 393-99).

(A.R. 314). Plaintiff then was taking Vicodin and ibuprofen for pain (A.R. 314).

On examination, Plaintiff reportedly was 6'2" tall and weighed 322 pounds (A.R. 315). Plaintiff reportedly had an antalgic gait, stooped while walking, appeared uncomfortable, and had limited range of motion in the cervical, thoracic and lumbar spine (A.R. 315-17, 331-41). Cervical spine x-rays showed mild to moderate uncinate arthrosis from C4-C6 bilaterally causing minimal to mild intervertebral foraminal encroachment, moderate discogenic spondylosis from C4-C7, mild loss of normal cervical lordosis and mild right inclination of the cervical spine (A.R. 317-18, 326-28). Dr. Marlowe diagnosed traumatic brain injury, cervical spine strain mild to moderate uncinate arthrosis from C4-C6, moderate discogenic spodylosis from C4-C7, thoracic spine strain/fracture, lumbar spine strain, rib and lung injury, headaches and blurred vision (A.R. 318). Dr. Marlowe requested a thoracic MRI, neurological evaluation, an internal medicine evaluation, and copies of Plaintiff's prior medical records so he could further assess Plaintiff's condition and treatment needs (A.R. 319; see also A.R. 345-47 (Dr. Marlowe's subsequent review of the available medical records)). Dr. Marlowe prescribed Norco and found Plaintiff temporarily totally disabled for six weeks (A.R. 319, 322). Dr. Marlowe's office continued to prescribe Norco and continued Plaintiff's temporary total disability through June of 2014, which was one and a half years after the accident. See A.R. 348-51, 363-64, 407-10, 420-24, 432-39, 479-82, 508-11, 519-26, 529-32 (progress reports).
///

Meanwhile, on May 29, 2013, neurologist Dr. Martin Backman evaluated Plaintiff for a head injury (A.R. 376-83).  Plaintiff complained of daily recurrent, pounding suboccipital headaches radiating to the retroocular area for which he required 800 milligrams of ibuprofen three times a day (Plaintiff reportedly then was trying to avoid taking Vicodin), positional vertigo, involuntary eye movements, blurry vision, depression, irritability, anxiety, and problems with attention, concentration, short term memory and sleep (A.R. 377).  Dr. Backman noted some abnormalities with respect to Plaintiff's eyes and tenderness in the spine, and diagnosed status post closed head injury with question of loss of consciousness, mild traumatic brain injury, posttraumatic head syndrome with suboccipital headaches, and posttraumatic labyrinthine concussion (A.R. 379-80).  Dr. Backman did not address Plaintiff's musculoskeletal complaints (A.R. 380).  Dr. Backman recommended a brain MRI to rule out basilar skull fracture, an auditory and balance evaluation, and suboccipital nerve blocks for Plaintiff's headaches (A.R. 380).

On December 10, 2013, Dr. Marlowe again reviewed the medical records and requested a pain management evaluation (A.R. 487-93).  On December 24, 2013, pain management specialist Dr. Eduardo Anguizola reviewed medical records and examined Plaintiff (A.R. 499-505).  Plaintiff reportedly complained of mostly right-sided headaches and neck pain (A.R. 500).  Plaintiff then was taking Vicodin and ibuprofen for pain (A.R. 500).  On examination, Plaintiff reportedly was able to ambulate on heels and toes without assistance, and had tenderness in his cervical spine over the occipital nerve on the right side, over the C2-C4 facets on the right more than the left, and midline

tenderness with paravertebral muscular tenderness (A.R. 501-02). Per Dr. Marlowe's September, 2013 report, Plaintiff reportedly had some vertigo affecting his driving and was being referred to pain management for the suboccipital nerve blocks recommended by Dr. Backman (A.R. 502). Plaintiff also reportedly was being treated with acupuncture to the neck and mid and lower back (A.R. 502).

Dr. Anguizola reviewed an April, 2013 cervical spine MRI reportedly showing disc protrusions, annular tearing and cervical facet arthropathy at C2-C3, central disc protrusion and facet arthropathy at C3-C4 and C4-C5, bilateral central disc protrusion and osteophyte complex, facet hypertrophy, neural foraminal stenosis at C5-C6, left paracentral central disc protrusion with annular tearing, hypertrophic facets, bilateral neural foraminal stenosis at C6-C7, and disc protrusion with osteophyte complex and facet hypertrophy at C7-T1 (A.R. 502). Dr. Anguizola diagnosed cephalalgia, occipital neuralgia on the right, cervicogenic headaches, cervical facet arthropathy and cervical discogenic disease (A.R. 503). Plaintiff's treatment to that point reportedly had included physical therapy, acupuncture, and oral and topical "pharmacologics," but Plaintiff still reportedly had a significant amount of axial pain in the neck and right-sided headaches (A.R. 503). Dr. Anguizola agreed that Plaintiff needed an occipital nerve block on the right side and a C2-C3 facet block (A.R. 503).

On March 10, 2014, orthopedic surgeon and Agreed Medical Examiner Dr. Thomas Jackson reviewed the medical record and evaluated Plaintiff (A.R. 621-41). Plaintiff complained of neck pain, arm pain, lower back pain and leg pain (A.R. 621-22). Dr. Jackson stated that

Plaintiff had undergone "conservative" treatment since the accident, with "very little actually authorized for treatment by the industrial insurance carrier" (A.R. 633).

On examination, Plaintiff reportedly had a slightly right antalgic gait, limited range of motion in the cervical and lumbar spine, mild to moderate tenderness in the left paraspinal muscles, minimal tenderness in the trapezius muscles, "mild plus" tenderness over the right side nerve roots with "moderate plus" tenderness over the left side nerve root of the neck, localized neck pain, "trace + symmetrical" deep tendon reflexes at the brachioradialis, mild to moderate tenderness over the lumbar spinous process mainly at the lower levels toward the lumbosacral junction, "moderate plus" tenderness over the sciatic nerves, moderate decreased sensation to the dorsum of the left foot, significant lower back complaints with flexion in the hips, flat feet with over pronation and some collapse on the medial side, and positive straight leg raising tests (A.R. 623-25).[3] Dr. Jackson diagnosed moderate degenerative disc disease and severe spondylosis of the cervical spine at C4-C5, C5-C6 and C6-C7, disc bulges and annular tears plus stenosis at every level associated with bilateral upper extremity radiculitis, left rib fractures of the third, fourth and fifth ribs associated with a small pneumothorax, and

_____

[3]     Cervical spine x-rays taken in March of 2014 showed moderate degenerative disc disease and severe spondylosis of the uncovertebral joints at C4-C5, C5-C6 and C6-C7, with some bony foraminal narrowing at each of the levels (A.R. 640). Lumbar spine x-rays showed severe degenerative disc disease at L4-L5 and L5-S1 with moderate to severe degenerative disease at other levels, plus a degenerative grade I spondylolisthesis at L4-L5 and severe spondylosis at every level with loss of lordosis and mild left scoliosis (A.R. 641).

old healed fractures of the third through ninth right ribs, severe degenerative disc disease at L4-5 and L5-S1 and moderate to severe degenerative disc disease at the other levels, severe spondylosis plus disc bulges and stenosis of the lumbar spine at every level associated with Grade I degenerative spondylolisthesis at L4-L5 plus bilateral lower extremity radiculitis and apparent left L5 sensory radiculopathy, and severe exogenous obesity with hypertension and diabetes (A.R. 632).

Dr. Jackson opined that Plaintiff would be precluded from: (1) repetitive neck movements in flexion, extension, rotation, and lateral bending; (2) heavy lifting, pushing, and pulling, and all other activities of comparable physical effort; (3) "substantial work" which is "half way between a light work restriction and a heavy work restriction"; and (4) "prolonged sitting and prolonged working in a stationary standing position" (A.R. 635). Dr. Jackson recommended continued treatment with pain medications, a medical weight loss program, a series of cervical and lumbar epidural injections with booster injections, cervical and lumbar medial branch blocks followed by a radiofrequency procedure, and ultimately surgery for an anterior cervical discectomy and fusion at C4-C5, C5-C6 and C6-C7, with consideration of a posterior fusion at the same levels, and posterior decompression and fusion of the lumbar spine at L4-L5 and L5-S1,

///
///
///
///
///

followed by post-operative physical therapy (A.R. 635-36).[4]

On May 25, 2014, Dr. Marlowe reviewed the medical records and prepared a "Supplemental Medical-Legal Report" (A.R. 538-52). Dr. Marlowe stated that Plaintiff had undergone "conservative" treatment with "very little actually authorized for treatment by the industrial insurance carrier" (A.R. 543). Physical therapy and acupuncture reportedly had worsened Plaintiff's symptoms, and the insurance carrier had denied epidural injections (A.R. 543). Dr. Marlowe indicated that Plaintiff was a candidate for epidural steroid injections and medial branch blocks, followed by a radiofrequency procedure, but Dr. Marlowe was hesitant to recommend surgery "strongly" because of the extensive structural damage in the cervical and lumbar spine and because of Plaintiff's exogenous obesity (A.R. 543).[5]

----

[4]     Dr. Jackson reviewed the record and re-evaluated Plaintiff on May 20, 2015, noting complaints and findings on examination similar to those stated in Dr. Jackson's prior evaluation of Plaintiff (A.R. 600-20). Plaintiff still had not been approved by the insurance carrier for less "conservative" treatment (A.R. 614). Dr. Jackson made the same work preclusions and treatment recommendations as before, explaining that, if Plaintiff could get his weight below 250 pounds, he would be a potential candidate for surgery for the cervical spine and lumbar spine (A.R. 615-17).

[5]     A thoracic spine x-ray taken in May of 2014 showed dextroconvex scoliosis, degenerative marginal ostoephytes of the anterior and lateral endplates of the thoracic vertebral bodies, and degenerative osteosclerosis along the superior and inferior endplates of most thoracic vertebral bodies (A.R. 589-90). A cervical spine x-ray showed straightening of the cervical lordosis and degenerative marginal osteophytes off the anterior inferior endplate of C6 (A.R. 592-94). A lumbar spine x-ray showed levoconvex lumbar scoliosis, decreased disc height at T12-
(continued...)

The progress report of Dr. Marlowe's Physician's Assistant, dated March 28, 2014, states that Plaintiff had suffered increased pain with chiropractic treatment, so insurance authorization was requested for the facet block at C2-C3 and occipital nerve block previously suggested by Dr. Anguizola (A.R. 553). The PA directed Plaintiff's return to modified work duties as of May 28, 2014, assertedly per Dr. Jackson's March 10, 2014 opinion (A.R. 556). Plaintiff was to engage in no heavy lifting, pushing or pulling of 50 pounds, and no "prolonged positioning of the cervical spine" (A.R. 556).

On July 2, 2014, Dr. Marlowe noted that injections had been denied and indicated "Release/P&S" (permanent and stationary), with the same modified work restrictions as before (A.R. 557-59). On August 1, 2014, however, Dr. Marlowe returned Plaintiff to temporary total disability status for six weeks, stating that Plaintiff's pain increased with driving and prolonged walking, and Plaintiff was still awaiting insurance authorization for injections (A.R. 561-64). On November 20, 2014, Dr. Marlowe returned Plaintiff to the modified work duties as assertedly per Dr. Jackson's opinion (i.e., no repetitive neck motion, no heavy lifting, pushing, or pulling, no "substantial work" and no prolonged sitting or standing) (A.R. 684-87); see also A.R. 691, 707, 716, 742, 992 (approving same modified work duties in

---

[5](...continued)
L1 through L5-S1, degenerative marginal osteophytes off the right lateral and left lateral and superior and inferior endplate and at T12 through L5, degenerative marginal osteophytes off the anterior inferior endplates of T12 through L5 and anterior superior endplates of L1 through S1, and degenerative osteosclerosis involving the apposing endplates of T12-L1 through L5-S1 (A.R. 595-97).

December of 2014, and February, March, May and June of 2015).

Meanwhile, on January 13, 2015, pain management specialist Dr. Hooman Rastegar reviewed diagnostic studies and evaluated Plaintiff for occipital nerve blocks for Plaintiff's headaches (A.R. 692-98). Plaintiff complained of constant pain in his cervical spine radiating to his shoulder and upper extremities with associated headaches (A.R. 692-93). On examination, Plaintiff had paracervical muscle tenderness, a limited range of motion in the cervical spine and tenderness over the occipital nerve (A.R. 694). Plaintiff then weighed 312 pounds (id.). Dr. Rastegar diagnosed bilateral occipital neuralgia with a note to rule out cervical headaches and discogenic pain (A.R. 695). Dr. Rastegar also diagnosed axial neck pain with a note to rule out facet arthropathy versus discogenic pain (A.R. 695). Dr. Rastegar gave Plaintiff bilateral occipital nerve blocks, and planned to repeat the blocks if they proved helpful (A.R. 696). Dr. Rastegar indicated that, if the blocks proved unhelpful, he would consider medial branch nerve blocks at C2-C4 (A.R. 696).[6]

Consultative examiner Dr. Bahaa Girgis prepared an Internal Medicine Evaluation dated January 29, 2015 (A.R. 667-72). Dr. Girgis reviewed no medical records (A.R. 669). Plaintiff complained of diabetes, cervical disc disease and migraines (A.R. 667). On examination, Plaintiff reportedly walked and moved easily, weighed 293 pounds, had a limited range of motion in the neck, was able to get on and off the examination table using a cane, and his gait was normal,

---

[6]     On February 11, 2015, Plaintiff reported to Dr. Marlowe that the nerve blocks did not help his migraines (A.R. 704-07).

although he "may require a cane for long-distance due to pain in his neck" (A.R. 669-71). Dr. Girgis diagnosed diabetes with possible diabetic neuropathy, well-controlled hypertension, cervical disc disease status post slip and fall, and migraine headaches status post trauma (A.R. 671-72). Dr. Girgis again stated that Plaintiff may require a cane for walking long distance "for pain control" (A.R. 671). Dr. Girgis opined that Plaintiff would have the capacity for a range of light work (i.e., Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for six hours in an eight-hour workday "with frequent stops of 10 minutes per hour," sit for six hours in an eight-hour workday, with occasional postural activities, and no manipulation limits) (A.R. 672).

Dr. Girgis also completed a "Need for Assistive Hand-Held Device for Ambulation" form indicating a "temporary" need for a cane for one year due to cervical disc disease and chronic neck pain (A.R. 673). The cane reportedly was needed for pain relief and for stairs, inclines and uneven surfaces (A.R. 673). Dr. Girgis also indicated that a cane was necessary for "prolonged ambulation" (i.e., for distances greater than one block or 100 yards), but that Plaintiff could stand and walk without a cane "at least" two hours in an eight-

///
///
///
///
///
///
///

hour day (A.R. 673).[7]

Plaintiff's pain management was transferred to Dr. Atef Rafla, who reviewed the medical records and evaluated Plaintiff on April 2, 2015 (A.R. 722-33). Plaintiff complained of progressively limited range of motion of the neck with severe muscle spasms, frequent moderate to severe headaches with blurred vision, tingling, numbness and weakness in the upper extremities, severe lower back pain, severe muscle spasm and progressively limited range of motion of the lumbar spine, with pain radiating to both legs and associated tingling, numbness and weakness, and pain in both buttocks radiating to the posterior and lateral thighs with numbness and tingling (A.R. 723). On examination, Dr. Rafla reported loss of normal cervical lordosis, pain on palpation from C4-C7, increased tone in the left trapezius with point tenderness of severe myofascial pain on deep palpation with severe guarding, positive cervical compression and distraction tests, positive Adson test, limited range of motion in the cervical spine and upper extremities and radiculopathy following dermatomal distribution from C4-C7 (A.R. 725-28). Dr. Rafla also reported some difficulty walking on heels and toes, straightening of lumbar lordosis, severe myofascial pain and guarding on palpation of the lumbar spine,

_____

[7]     Non-examining state agency physicians reviewed the record in April and June of 2015 and found Plaintiff capable of light work with occasional postural limitations, reportedly giving great weight to Dr. Girgis' opinion (A.R. 95-122; see also A.R. 677 (state agency physician "Case Analysis" form dated April 6, 2015, stating, "No demonstrated need for a cane. Comment also made regarding CE [consultative examiner] statement regarding a cane.")). State agency physicians reviewed Dr. Jackson's May 20, 2015 opinion and gave this opinion "less weight" as "not supported by evidence" (A.R. 117-18).

tingling and numbness to the legs in the L3-S1 dermatomes, sharp shooting pain down the thighs on palpation of the sacroiliac joints, limited range of motion in the lumbar spine, "strongly positive" straight leg raising tests, ambulation with a mild limp, and positive Gaenslen's sign, sacroiliac joint thrust and Patrick Fabere tests (A.R. 725-28). Dr. Rafla diagnosed cervical spine sprain/strain, cervical paraspinal muscle spasms, cervical disc herniation, cervical radiculitis/radiculopathy of both upper extremities, lumbar spine sprain/strain, lumbar paraspinal muscle spasms, lumbar disc herniations, lumbar radiculitis/radiculopathy of both lower extremities, and sacroilitis of both sacroiliac joints (A.R. 730). Dr. Rafla requested authorization for a cervical epidural steroid injection at C7-T1 with catheter to C4-C7, and bilateral lumbar epidural steroid injections at L5-S1 with catheter to L2-S1 (A.R. 730-31). Dr. Rafla also prescribed Norco (A.R. 731).

Plaintiff returned to Dr. Rafla on May 14, 2015, complaining of worsening pain (A.R. 977-85). Dr. Rafla again requested authorization for the epidural steroid injections and again prescribed Norco (A.R. 983, 986). In June of 2015, Dr. Rafla again requested authorization for the injections (A.R. 976).

Prior to his surgery, Plaintiff regularly was prescribed Norco for his pain. See, e.g., A.R. 911-12, 1037, 1044, 1053, 1061, 1088, 1106, 1115, 1129, 1144, 1153, 1159, 1168. Plaintiff eventually was given left shoulder steroid injections on July 11 and November 28, 2016, which reportedly helped with the pain (A.R. 1070, 1075, 1136-37). Plaintiff was given lumbar epidural steroid injections on

July 25 and August 29, 2016, which he reported gave him some relief (A.R. 1104, 1113-14, 1126-27). Plaintiff was given a cervical epidural steroid injection on September 27, 2016, which he reported gave him no relief (A.R. 1086, 1096-97). Plaintiff underwent cervical spine surgery on March 21, 2017 (A.R. 948-50, 956-69; see also A.R. 800-02, 847-48, 860, 888-89, 897-98, 940-47, 951-54 (pre-operative evaluations and testing)).

## II. **Summary of Plaintiff's Testimony and Statements.**

The hearing occurred two months after the cervical spine surgery, and Plaintiff then was wearing a temporary neck brace (A.R. 70, 75-76). Plaintiff reported that he was still in a lot of pain for which he was receiving injections in his lower back and shoulders as well as pain medication (A.R. 75-78). Plaintiff was also being treated for depression and anxiety related to his asserted inability to work (A.R. 76-77).[8]

Plaintiff said he had been using a cane since 2013 because his lower back would "give way" and almost cause him to fall (A.R. 69-70). Plaintiff said that he walks up and down his block using a cane, takes his two dogs for "little" walks using his cane, takes his medications, sits on the couch watching television, and then, by 1 p.m., he has to go back to bed for two to three hours to get off his feet (A.R. 71, 73). Plaintiff said his back and neck pain limit how long he can walk, sit and stand because of compression on his spine (A.R. 71, 73-

---

[8] The Court has not summarized the records regarding Plaintiff's mental health treatment.

1   74).

3   Plaintiff estimated that he could lift up to ten pounds (A.R.
4   74). Plaintiff said he could walk for approximately one block at a
5   time (A.R. 74). Plaintiff estimated that he could be on his feet for
6   up to half an hour at a time, for a total of up to two hours a day
7   before his back would give out (A.R. 75). Plaintiff admitted that he
8   could walk around his house without a cane, but said he had fallen at
9   home, and said that he used his cane whenever he walked any kind of
10  distance (A.R. 71). Plaintiff had reported to his doctor shoulder
11  problems which assertedly limited Plaintiff's reaching (A.R. 72).
12  According to Plaintiff, his doctor suggested a shoulder replacement,
13  but said that Plaintiff's neck would need to be fixed before such a
14  shoulder replacement (A.R. 72).

16  In a Function Report - Adult form dated July 14, 2015 (pre-
17  surgery and before the date last insured), Plaintiff reported that his
18  back injuries prevented prolonged standing or sitting, his neck
19  prevented him from driving because he could not turn his neck quickly,
20  his migraines from his spine injury were debilitating, his orthopedic
21  pain was overwhelming, and without strong pain medication he would
22  have been in the hospital (A.R. 254). Plaintiff reported that lying
23  flat was the best way to help with his pain (A.R. 254). Plaintiff
24  reported he could do his own laundry and could water plants for 10
25  minutes at a time (A.R. 256). Plaintiff reported he could walk 30
26  yards before needing to rest for five minutes (A.R. 259). Plaintiff
27  stated that he used a cane for walking (A.R. 260). Plaintiff stated
28  that Dr. Jackson recommended that someone do surgery on Plaintiff's

back (A.R. 261).[9]

III. **The ALJ Erred in Discounting Plaintiff's Testimony and Statements Regarding the Severity of Plaintiff's Symptoms Without Stating Legally Sufficient Reasons for Doing So.**

Where, as here, an ALJ finds that a claimant's medically determinable impairments reasonably could be expected to cause some degree of the alleged symptoms of which the claimant subjectively complains, any discounting of the claimant's complaints must be supported by "specific, cogent" findings. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010); Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995); but see Smolen v. Chater, 80 F.3d 1273, 1282-84 (9th Cir. 1996) (indicating that ALJ must state "specific, clear and convincing" reasons to reject a claimant's testimony where there is no

---

[9]    In a Function Report - Adult - Third Party form also dated July 14, 2015, Plaintiff's wife reported that Plaintiff's pain limited everything he did, and that Plaintiff could not drive and had limited walking (A.R. 245). She stated that Plaintiff could walk to the mailbox once a day, but otherwise sat in his recliner and watched television or listened to music, or lay in bed and slept three to four hours (A.R. 246, 250). She stated that Plaintiff sometimes did laundry and washed dishes for approximately five minutes at a time, but he reportedly could not stand in one place for long (A.R. 248). Plaintiff's wife also reported that Plaintiff's doctor had told Plaintiff not to drive because turning his head made Plaintiff's pain worse (A.R. 249). She also indicated that Plaintiff's conditions affected his lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory and concentration (from the pain medications) (A.R. 251). She estimated that Plaintiff could walk 30 to 35 yards before needing to rest (A.R. 251). She reported that Plaintiff had been using a cane when he went out for appointments where he would have to walk "a lot" (A.R. 252).

evidence of malingering).[10]  Generalized, conclusory findings do not

suffice.  See Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004)

(the ALJ's credibility findings "must be sufficiently specific to

allow a reviewing court to conclude the ALJ rejected the claimant's

testimony on permissible grounds and did not arbitrarily discredit the

claimant's testimony") (internal citations and quotations omitted);

Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001) (the ALJ

must "specifically identify the testimony [the ALJ] finds not to be

credible and must explain what evidence undermines the testimony");

Smolen v. Chater, 80 F.3d at 1284 ("The ALJ must state specifically

which symptom testimony is not credible and what facts in the record

lead to that conclusion."); see also Social Security Ruling ("SSR")

96-7p (explaining how to assess a claimant's credibility), superseded,

SSR 16-3p (eff. March 28, 2016).[11]

///

_____

[10]    In the absence of an ALJ's reliance on evidence of
"malingering," most recent Ninth Circuit cases have applied the
"clear and convincing" standard.  See, e.g., Leon v. Berryhill,
880 F.3d 1041, 1046 (9th Cir. 2017); Brown-Hunter v. Colvin, 806
F.3d 487, 488-89 (9th Cir. 2015); Burrell v. Colvin, 775 F.3d
1133, 1136-37 (9th Cir. 2014); Treichler v. Commissioner, 775
F.3d 1090, 1102 (9th Cir. 2014); Ghanim v. Colvin, 763 F.3d 1154,
1163 n.9 (9th Cir. 2014); Garrison v. Colvin, 759 F.3d 995, 1014-
15 & n.18 (9th Cir. 2014); see also Ballard v. Apfel, 2000 WL
1899797, at *2 n.1 (C.D. Cal. Dec. 19, 2000) (collecting earlier
cases).  In the present case, the ALJ's findings are insufficient
under either standard, so the distinction between the two
standards (if any) is academic.

[11]    The appropriate analysis under the superseding SSR is
substantially the same as the analysis under the superseded SSR.
See R.P. v. Colvin, 2016 WL 7042259, at *9 n.7 (E.D. Cal. Dec. 5,
2016) (stating that SSR 16-3p "implemented a change in diction
rather than substance.") (citations omitted); see also Trevizo v.
Berryhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (suggesting that
SSR 16-3p "makes clear what our precedent already required").

In the present case, the ALJ discounted Plaintiff's testimony and statements as "inconsistent with the medical evidence of record" (A.R. 28). The ALJ acknowledged that the medical evidence "reveals positive, objective physical, clinical, and diagnostic findings demonstrating degenerative changes at the cervical, thoracic and lumbar spine" (A.R. 28). The ALJ also acknowledged that Plaintiff underwent spine surgery in March of 2017 (less than three months after the date last insured) (A.R. 28). However, the ALJ cited Plaintiff's allegedly "routine and conservative" treatment "consisting primarily of prescribed pain medication during the relevant period prior to the date last insured" (A.R. 28). The ALJ also cited an alleged inconsistency between Plaintiff's asserted limitations and Dr. Marlowe's opinion that Plaintiff could return to work with modified duties during a portion of the relevant time period (A.R. 28).

A limited course of treatment sometimes can justify the rejection of a claimant's testimony, at least where the testimony concerns physical problems. See, e.g., Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) (lack of consistent treatment, such as where there was a three to four month gap in treatment, properly considered in discrediting claimant's back pain testimony); Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (in assessing the credibility of a claimant's pain testimony, the Administration properly may consider the claimant's failure to request treatment and failure to follow treatment advice) (citing Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991) (en banc)); Matthews v. Shalala, 10 F.3d 678, 679-80 (9th Cir. 1993) (permissible credibility factors in assessing pain testimony include limited treatment and minimal use of medications);

see also Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995)
(absence of treatment for back pain during half of the alleged
disability period, and evidence of only "conservative treatment" when
the claimant finally sought treatment, sufficient to discount
claimant's testimony).

In the present case, however, it is highly doubtful Plaintiff's
treatment accurately may be characterized as "conservative" within the
meaning of Ninth Circuit jurisprudence (even though Plaintiff's
doctors sometimes used the term "conservative" to reference
Plaintiff's treatment prior to his epidural injections and surgery,
see A.R. 543, 614, 633).  As detailed above, the record shows that
Plaintiff regularly sought treatment from several providers throughout
the alleged disability period, followed up as ordered and complied
with all treatment suggestions, including physical therapy,
acupuncture, and narcotic pain medication before ultimately being
approved for receiving multiple epidural injections and surgery.
Doctors recommended epidural injections and surgery for Plaintiff's
spine as early as March of 2014, but delay in such treatment
apparently resulted from difficulty in securing authorization from
Plaintiff's insurance provider.  See A.R. 543, 614, 633.  No negative
inference regarding the accuracy of Plaintiff's subjective complaints
properly may be drawn from insurance delays in authorizing recommended
treatment.  See, e.g., Escobar v. Colvin, 2016 WL 4411484, at *3 (C.D.
Cal. Aug. 16, 2016); Napier v. Colvin, 2015 WL 6159464, at *4 (C.D.
Cal. Oct. 20, 2015).
///
///

Moreover, even Plaintiff's pre-surgery treatment with Norco and epidural steroid injections do not appear to have been "routine" or "conservative," as those terms are used in case law.  See, e.g., Childress v. Colvin, 2014 WL 4629593, at *12 (N.D. Cal. Sept. 16, 2014) ("[i]t is not obvious whether the consistent use of [Norco] (for several years) is 'conservative' or in conflict with Plaintiff's pain testimony"); Aguilar v. Colvin, 2014 WL 3557308, at *8 (C.D. Cal. July 18, 2014) ("It would be difficult to fault Plaintiff for overly conservative treatment when he has been prescribed strong narcotic pain medications"); Christie v. Astrue, 2011 WL 4368189, at *4 (C.D. Cal. Sept. 16, 2011) (refusing to characterize as "conservative" treatment including use of narcotic pain medication and epidural injections).

With regard to the alleged inconsistency between Plaintiff's subjective complaints and Dr. Marlowe's opinion, the ALJ could not reject Plaintiff's subjective statements and testimony on the sole ground that the statements and testimony were not fully corroborated by the medical evidence.  See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) ("lack of medical evidence" can be "a factor" in rejecting a claimant's credibility, but cannot "form the sole basis"); see also Burch v. Barnhart, 400 F.3d at 681 (asserted inconsistencies between a claimant's subjective complaints and the objective medical evidence can be a factor in discounting a claimant's subjective complaints, but cannot "form the sole basis").

In sum, the ALJ failed to state legally sufficient reasons to discount Plaintiff's subjective complaints.  The Court is unable to

conclude that this error was harmless.  "[A]n ALJ's error is harmless

where it is inconsequential to the ultimate non-disability

determination."  Molina v. Astrue, 674 F.3d 1104, 1115 (9th Cir. 2012)

(citations and quotations omitted).  Here, the vocational expert

testified that, if someone were limited to lifting and carrying only

10 pounds, or if someone required the use of a cane for standing and

walking for more than two hours out of an eight-hour work day, it

would preclude Plaintiff's past relevant work and there would be no

transferrable skills, which would direct a finding of disabled under

the Grids (A.R. 85, 90, 93).  The vocational expert did not testify

there are jobs performable by a person as limited as Plaintiff claims

to be (A.R. 79-93).

## IV.  **Remand for Further Administrative Proceedings is Appropriate.**

Remand is appropriate because the circumstances of this case

suggest that further development of the record and further

administrative review could remedy the ALJ's errors.  See McLeod v.

Astrue, 640 F.3d 881, 888 (9th Cir. 2011); see also INS v. Ventura,

537 U.S. 12, 16 (2002) (upon reversal of an administrative

determination, the proper course is remand for additional agency

investigation or explanation, except in rare circumstances); Leon v.

Berryhill, 880 F.3d at 1044 (reversal with a directive for the

immediate calculation of benefits is a "rare and prophylactic

exception to the well-established ordinary remand rule"); Dominguez v.

Colvin, 808 F.3d 403, 407 (9th Cir. 2015) ("Unless the district court

concludes that further administrative proceedings would serve no

useful purpose, it may not remand with a direction to provide

benefits"); <u>Ghanim v. Colvin</u>, 763 F.3d at 1166 (remanding for further proceedings where the ALJ failed to state sufficient reasons for deeming a claimant's testimony not credible); <u>Treichler v. Commissioner</u>, 775 F.3d at 1101 n.5 (remand for further administrative proceedings is the proper remedy "in all but the rarest cases"); <u>Vasquez v. Astrue</u>, 572 F.3d 586, 600-01 (9th Cir. 2009) (a court need not "credit as true" improperly rejected claimant testimony where there are outstanding issues that must be resolved before a proper disability determination can be made). There remain significant unanswered questions on the present record. For example, it is not clear whether the ALJ would be required to find Plaintiff disabled for the entire claimed period of disability even if Plaintiff's testimony were fully credited. See <u>Luna v. Astrue</u>, 623 F.3d 1032, 1035 (9th Cir. 2010).

///

///

///

///

///

///

///

///

///

///

///

///

///

///

**CONCLUSION**

For all of the foregoing reasons,[12] Plaintiff's and Defendant's motions for summary judgment are denied and this matter is remanded for further administrative action consistent with this Opinion.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: April 17, 2019.

_____/s/_____
                    CHARLES F. EICK
              UNITED STATES MAGISTRATE JUDGE

---

[12] The Court has not reached any other issue raised by Plaintiff except insofar as to determine that reversal with a directive for the immediate payment of benefits would not be appropriate at this time.